UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICHAEL BELL,

            Plaintiff,

            v.

FISHING COMPANY OF ALASKA,

            Defendant.

CASE NO. C06-195RSM

MEMORANDUM AND DECISION

Plaintiff Michael Bell brings this seaman's injury action pursuant to the Jones Act, 46 U.S.C. § 30104, and general maritime law. He alleges that he was injured while working aboard the *F/V Alaska Ranger,* owned by defendant Fishing Company of Alaska, while the vessel was on a fishing voyage in the Bering Sea. Defendant has denied liability for plaintiff's injuries.

An earlier decision by this Court granting summary judgment to the defendant was reversed by the Ninth Circuit Court of Appeals, and the matter was remanded to this Court for trial. The appellate court ruled that plaintiff's testimony regarding the role of a trash can at the bottom of a stairway in causing his injury created an issue of fact for trial. The parties agreed to bifurcate liability and damage issues for trial. The liability issue was tried to the Court in a one-day bench trial held on May 26, 2009. The Court has fully considered the evidence presented at trial, the exhibits admitted into evidence, and the argument of counsel, and being fully advised, now makes the following Findings of Fact and Conclusions of Law, and renders a decision.

MEMORANDUM AND DECISION - 1

FINDINGS OF FACT

1. Michael Bell is a resident of Oregon. He signed a contract of employment with defendant on March 21, 2005 and traveled to Dutch Harbor, Alaska sometime thereafter to board the vessel. Born August 18, 1975, plaintiff was twenty-nine years old on the date of his injury, April 5, 2005. His employment on the *F/V Alaska Ranger* was his first experience in commercial fishing. Prior to that he served three years in the Marine Corps as a truck driver, and then worked in various laborer, maintenance, and equipment operator positions. He was in an automobile accident in 2004 and suffered injury to his back at that time; he subsequently received a settlement of $10,000 for this injury.

2. The *F/V Alaska Ranger* was a fishing and processing vessel that was designated as an "uninspected" vessel. Plaintiff was employed in the processing area of the ship. He was on the ship for approximately one week before April 5, 2005. He was at all relevant times a seaman, as that term is defined by general maritime law and the Jones Act, employed in the services of the *F/V Alaska Ranger*.

3. Plaintiff testified that upon boarding the vessel he did not receive any indoctrination or orientation. Later, when specifically questioned about training in going up or down stairs, he responded that the captain instructed the new crew members to have "one hand for the boat and one hand for ourselves." He testified that he understood this to mean that a seaman should have "one hand either on a rail or something fixed as you're moving about and one hand maybe to catch yourself or what have you, to avoid a fall."

4. Plaintiff's quarters were one deck above the galley area and connected to it by a stairway. Plaintiff testified that he used that stairway four to five times a day to go between his quarters and the galley or his work station in the processing area. The stairway, as shown in photographs and as described in the testimony of the various witnesses, led toward the rear of the boat, so that as a crewman descended the stairs, his right side was toward the port side of the boat. The individual steps were metal with a grated non-slip tread, and a rounded front edge. The stairway was twenty-four inches wide, with a railing running the length of the lefthand (starboard) side, attached to the bulkhead. The right (port) side was open, but there was a structural post at the bottom, as well as a ring or flange fifteen to twenty inches deep around the opening where the stairs passed through the floor. This ring covered part of the right side descending, and could be held with the right hand for stability while descending that part of the

MEMORANDUM AND DECISION - 2

stairway. Copies of two photographs of the stairway, looking down it from above, are attached to this Order. Defendants' Exhibit 103-1, 103-2.

5. On April 5, 2005, plaintiff returned to his quarters from the processing area to retrieve a different pair of glove liners. He wore the standard rubber boots, with non-slip tread, that were worn by all the crewmen. An example of this boot was admitted as an exhibit at trial. Plaintiff testified that he "approached the stairwell and the boat had some movement and I was trying to counterbalance that." He first testified that he was at the top of the stairwell when he slipped, but later stated he was "a couple of stairs into it." Plaintiff demonstrated with his flexed hand how the back of his left heel caught the edge of the step and slipped off. His left leg slid on down past the remaining steps to the deck. Plaintiff testified that as he slid, he tried to keep from "going into the garbage can" at the bottom of the stairs by twisting and reaching to the right so as to "re-direct" his fall. In doing so, he let go of the railing on the left side of the stairway. Plaintiff testified that he knew he was injured when "my left knee had struck the deck and at that point pretty much instantly swelled up and gave me problems along with a pulled groin and some strain on my lower back." Upon questioning as to whether his left knee actually struck the deck, he responded, "When my left foot hit the deck, it had twisted my knee from the impact."

6. The accident report that plaintiff filled out the following day described the fall as occurring as follows: "I was returning from my room to the production area & lost my footing & missed 5 (bottom) stairs. R[ight] leg still in place. L[eft] leg went to the deck & took the weight of the fall. No hands caught me & I did not hit the deck." Defendant's Trial Exhibit No. 106. He described his injuries as "L knee swollen & painful, gives way of its own will. R side groin & R lower back (butt) muscle spasm." *Id*. Under "What caused the accident" on the accident report form, plaintiff responded, "I was walking & the boat swayed left to right & my R[ight] boot heel had traction and I could not counter act the movement." *Id*. Nowhere in his handwritten accident report did plaintiff mention the trash can.

7. Plaintiff was shown photographs of the stairwell on the *F/V Alaska Ranger*. Plaintiff's Exhibit 1, A through G; Defendants' Exhibit 103. The photographs show a trash can near the bottom of the steps on the left side (descend), tucked into an alcove so that the arc of the trash can's rim, covered with a black plastic liner, projects a few inches into the pathway at the bottom of the stairs. Plaintiff testified that the trash can at the bottom of the stairs in the photo "appears to be quite a bit smaller" than the one

MEMORANDUM AND DECISION - 3

that caused his injury, and that it was not "bungeed" against the wall as the troublesome trash can had been. He stated, "I'm recalling a trash can bungeed around the corner, whether to the stairs or the wall, and this can appears to be quite a bit smaller." He testified that if the trash can in the photo had been "bungeed" against the wall, it would "pull it more into the stairwell." This conclusion is not credible. Had the trash can been secured to the wall with an elastic ("bungee") cord it would, if anything, have been pulled farther into the alcove and away from the stairway path. Plaintiff recalled that "about a third" of the stairwell landing was obstructed by the trash can on the date of his injury. This estimate is controverted by the photograph and by the credible statements of the captain, as set forth below.

8. Counsel directed plaintiff's attention to a black mark on the edge of the wall above the trash can, and asked him "what that would be from?" Plaintiff responded, "It appears to be from a larger can or obstruction or something that may have been on that corner." The black mark on the wall is not apparent in the exhibits available to the Court, and plaintiff's conclusion regarding its meaning is purely speculative.

9. Upon questioning by the Court, plaintiff described his slip and fall as "doing the splits" with his left foot in front and the right foot following behind. He then testified, "it all happened so quickly. I'm going down the stairs. I didn't want to fall in the garbage can. I reacted. Changed the direction of fall. And that's when my knee hit the deck. . . . Had that garbage can not been there I would have continued with my direction and recovered from that fall instead of fighting the natural direction that I was falling down those stairs." Plaintiff's conclusion that he could have recovered from the fall or landed differently is contrary to logic and unsupported by any evidence.

10. Plaintiff testified repeatedly that his left foot landed to the right of the trash can. The position of the trash can shown in the photograph, back in the alcove, is consistent with plaintiff's testimony that his foot landed to the right of it. Had the trash can itself been "bungeed" "around the corner," as plaintiff testified, it would have been attached to the wall past the alcove, much farther from the bottom of the stairs. In that case, plaintiff's foot could not have landed to the right of the trash can as he so definitively testified. On the other hand, if in stating that the trash can was "bungeed around the corner" plaintiff meant that the bungee cord itself was attached around the corner, the force of the elastic cord would have pushed the trash can back into the alcove, because the attachment point for the bungee cord would have

MEMORANDUM AND DECISION - 4

been nearly even with the left side of the stairway. That reading of plaintiff's testimony would be consistent with his testimony that his foot landed to the right of the trash can.

11. The Court does not find plaintiff an entirely credible witness. His responses on cross-examination regarding his work history were successfully challenged by defense counsel in several instances. He did not recall a "lost time" warning even after he was shown his signature on the actual document. Defendants' Exhibit 121. On direct, plaintiff could not recall any activities he had given up due to his injuries beyond "extreme backpacking and hiking, bungee jumping, pulling crab pots, and playing with my son." He thought he had brought a list of additional activities to the courtroom but could not find it, and upon further questioning could only recall bungee jumping, firewood cutting, and roughhousing with his nephew and son. Upon cross-examination, he admitted that he actually gave up bungee jumping after the 2004 automobile accident, well before his injury on the vessel.

Plaintiff's direct testimony that he was "right at the top of the stairs" when the fall occurred contradicts his own accident report, made shortly after the fall, which states that he missed the bottom five stairs. When reminded of this, he changed his testimony to state he was "a couple of stairs into it." Plaintiff also testified that he struck his left knee on the deck, a statement that is wholly at odds with his description of "doing the splits" with his left leg in front. When questioned on this point, he changed his testimony to state that his foot hit the deck, and "twisted the knee from the impact."

Plaintiff's testimony that the trash can obstructed one-third of the pathway at the bottom of the stairs is controverted by the photographs and the testimony of the captain and the chief mate. His statement that black marks on the wall indicated a larger trash can than the one in the photographs is purely speculative, and is contradicted by the credible testimony of the captain and chief mate, as shown below. His testimony that a bungee cord would have pulled the trash can out of the alcove and further into the stairwell path simply defies logic. Finally, his convoluted explanation of how he "re-directed" his fall to the right so as to avoid the trash can is not believable.

12. Defendant's expert John Dixon, a naval architect and marine engineer, testified regarding the stairs. He inspected the stairway aboard the *F/V Alaska Ranger* in Dutch Harbor in August 2005, and measured and tested it. He testified that the stairway was technically a "ship's ladder" due to the angle, and that he had seen approximately one thousand ship's ladders like this one. He further testified to the

MEMORANDUM AND DECISION - 5

difference between inspected and uninspected vessels, and stated that the Coast Guard is "literally all over vessels" fishing in the North Pacific on a regular basis, conducting both fisheries enforcement inspections and biannual safety inspections on so-called uninspected vessels.

13. Mr. Dixon testified that in his opinion, no deficiency of the ladder contributed to plaintiff's slip and fall. He further testified that in his opinion the ladder was "reasonably fit" for its intended purpose. He calculated that during the time the *F/V Alaska Ranger* was in service, crewmen made over one million trips up and down that stairway. He had no knowledge as to whether any crewman other than plaintiff had ever been injured on the ladder.

14. When asked to address standards and regulations that might apply to the ship's ladder, plaintiff's counsel objected that he had not put on a case with regard to violation of any standards. Although violation of OSHA and other regulatory standards was a claim argued earlier in the proceedings, plaintiff relinquished this claim during the direct examination of Mr. Dixon.

15. The Court finds Mr. Dixon a highly credible witness.

16. Captain William McGill, captain of the *F/V Alaska Ranger* from the early 1990's until 2006, testified that during that time he ascended and descended the ladder at least a dozen times a day. To his knowledge, no crewman other than plaintiff had ever been injured on the ladder. Captain McGill was knowledgeable about injuries aboard the vessel because injury reports are made to the captain on duty.

17. Captain McGill testified that the *F/V Alaska Ranger* was inspected by the Coast Guard at the biannual safety inspections (later changed to annual inspection), and during boardings at sea. On those boardings, teams of inspectors would "spread out all over the vessel doing in-depth safety inspection." Inspectors from the Alaska Department of Environmental Conservation also inspected the galley area for safety and health. No inspector ever commented on the ladder or the position of the trash can near the bottom.

18. Captain McGill described the *F/V Alaska Ranger* as a "well-founded vessel" which had weathered Bering Sea conditions of 30 foot seas and 80 knot winds, which he characterized as "pretty sporty weather." It was recorded in the ship's log by the captain that at 16:00 and 18:50 hour on April 5, 2005, the conditions were wind at northeast 15 to 20 knots with a two to three foot swell. The captain testified that in those seas, with gear out fishing, the *F/V Alaska Ranger* would have been fairly stable,

MEMORANDUM AND DECISION - 6

moving no more than three or four degrees of roll.

19. Captain McGill testified that he conducted safety training for new crewmen, advising them to keep one hand for the ship and one hand for themselves. He stated that this meant that "in any condition where they didn't feel comfortable, grab on, protect themselves."

20. When shown the photograph of the trash can in position near the bottom of the stairway, Captain McGill testified that it did not accurately depict the position of the trash can when the vessel was underway, as it would have been "bungeed" in. He stated that "usually it wouldn't extend out that far because it would be bungeed in." When asked which way the bungee would pull the trash can, he responded that if one is looking down the ladder, it would be more to the left.

21. Captain McGill testified that when the trash can was "bungeed" against the wall it did not obstruct free passageway up and down the ladder. He further testified that the trash can in the photographs was, from what he could see of it, the standard size that was in that place all the time.

22. When asked what would happen if the trash can were to obstruct the passageway, Captain McGill responded, "The Coast Guard would pop us for blocking an egress point. We would have—we would be violated right, left, and center, and safety would be compromised."

23. With respect to the ring around the stairway opening, Captain McGill testified that when descending the stairway he could hold onto the lip at the base of the ring with his right hand until the last step before the bottom.

24. Upon cross-examination, counsel asked Captain McGill if he personally observed the placement of the trash can on the date plaintiff claimed injury. He responded, "On a ship, you keep things in the proper place at the proper time, and the galley people kept that garbage can secured properly." When pressed on the question of whether he "specifically observed" the location of the garbage can that day, he answered, "I'll say I did not go down and specifically inspect the garbage cans. I was up and down the ladder during that day."

25. Also on cross-examination, plaintiff's counsel represented to Captain McGill that a logbook entry indicated that the plaintiff's injury was reported on April 6, 2005 rather than April 5, 2005. The logbook entry for conditions at 16:00 hour on April 6 showed that the seas were four to six feet, and winds twenty to thirty knots. Plaintiff's Exhibit 44. Counsel's question to the captain was "So basically

MEMORANDUM AND DECISION - 7

the date the accident was reported in the logbook the seas and winds were twice as bad, right?" Captain McGill responded, "If you say so." Defendant objected that counsel was mischaracterizing the evidence, because plaintiff's own report gave the date of injury as April 5, and the logbook entry only indicated the date that the injury was reported by plaintiff, not the date that it occurred. Upon re-direct, counsel for defendant sought to clarify the date of injury with Captain McGill, and plaintiff then stipulated that the injury occurred on April 5, the day the seas were light.

26. The Court finds Captain McGill a highly credible witness.

27. Jeffery Parker testified by way of deposition. Mr. Parker served as chief mate on the *F/V Alaska Ranger* in 2005 and alternated shifts with Captain McGill. Plaintiff reported his injury to chief mate Parker as he was the duty officer at the time. Mr. Parker's report states, under the section for a detailed description of the accident, "Mr. Bell claims that his foot caught on the tread of the ladder causing him to lose his balance and miss the last 5 stairs leading down to the deck landing on his left leg straining and twisting his left knee. Subsequently his right groin, buttox [sic] and lower back are experiencing some discomfort and spasming." Plaintiff's Exhibit 2. This report did not mention the presence of the trash can.

28. As to the trash can, Mr. Parker testified that to his recollection, the trash can did not obstruct any portion of the stairwell. He recalled that it extended from the alcove "probably even with the stairs."

29. While the Court did not have the benefit of observing Mr. Parker's demeanor during the deposition, it appears from the written that he is a highly credible witness.

30. The Court finds from this evidence that on April 5, 2005, at the time plaintiff slipped on the stairway, the trash can near the bottom of the stairs was the same size as the one shown in the exhibit photographs, was "bungeed" into place in the alcove, and was pulled further into the alcove than shown in the exhibit photographs which show an unsecured trash can. The rim of the trash can thus projected only a few inches into the area below the stairway; it did not obstruct one-third of the pathway as plaintiff claimed.

CONCLUSIONS OF LAW

MEMORANDUM AND DECISION - 8

Having found these facts from the evidence presented, the Court now makes the following Conclusions of Law:

1. Plaintiff filed this suit pursuant to the Jones Act, 46 U.S.C. § 30104, as amended October 2006, and general maritime law. The Court has jurisdiction of the matter pursuant to 28 U.S.C. § 1331. Venue is proper in this district due to defendant's presence here. The vessel *F/V Alaska Ranger* was owned by defendant who is a resident of this district.

2. The Jones Act, originally enacted as 46 U.S.C. § 688, provides that "a seaman injured in the course of his employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United Stated regulating recovery for personal injury to, or death of, railway employees apply to an action under this section. 46 U.S.C.§ 30104(a).

3. Plaintiff was a seaman within the meaning of the Jones Act on April 5, 2005.

4. In order to prevail on his negligence claim under the Jones Act, plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant was negligent, and that such negligence was the cause, however slight, of his injury. *In re Hechinger*, 890 F. 2d 202, 208 (9th Cir. 1989); *cert. Denied*, 498 U.S. 848 (1990).

5. The Court finds that plaintiff has not met his burden of proving, by a preponderance of the evidence, that the trash can, secured near the base of the stairway, played any part in causing his injury. The Court concludes from the facts found above that the trash can did not obstruct the pathway at the bottom of the stairs and it was not necessary for plaintiff to re-direct his fall to avoid hitting it. Further, there is no competent evidence that plaintiff would have landed differently were the trash can not there.

6. In order to prevail on his claim of unseaworthiness under the Jones Act, plaintiff has the burden of proving by a preponderance of the evidence that the *F/V Alaska Ranger* was unseaworthy, and that the unseaworthy condition was a cause of his injury. A vessel is seaworthy if the vessel and its parts and equipment are reasonably fit for their intended purpose, and operated by a crew which is reasonably adequate and competent for the work assigned. Conversely, the vessel is unseaworthy if the vessel or any of its equipment is not reasonably fit for its intended purpose, or if its crew is not reasonably adequate or competent to perform the work assigned. *Ribitzki v. Canmar Reading & Bates, Ltd. Partnership*, 111 F. 3d 658, 664 (9th Cir. 1997).

MEMORANDUM AND DECISION - 9

7. A vessel owner has a duty to provide adequate safety equipment for the vessel. However, the vessel owner is not required to furnish an accident-free ship. The vessel owner is not required to have the best parts and equipment, nor the finest of crews; it is required to have what is reasonably proper and suitable for its intended use. *Mitchell v. Trawler Racer*, 362 U.S. 539, 550 (1960); *Lee v. Pacific Far East Line*, 566 F. 2d 65, 67 (9th Cir. 1977).

8. Unseaworthiness is a cause of injury if it played a substantial part in bringing about injury to the plaintiff. *Ribitzki*, 111 F. 3d at 665. This is a different standard than the negligence standard.

9. The Court finds that plaintiff has failed to meet his burden of demonstrating, by a preponderance of the evidence, that there was an unseaworthy condition on the *F/V Alaska Ranger*. Plaintiff produced no evidence whatsoever to controvert the opinion of defendant's expert that the stairway was reasonably fit for its intended use. Nor did he produce evidence that anyone else had ever been injured on this stairway in the more than one million trips up and down by crewmen over the years that the vessel was in service. As to the trash can near the bottom of the stairway, the Court has found plaintiff's estimate that the trash can obstructed one-third of the passageway not credible in light of the photographs introduced into evidence and the highly credible testimony of Captain McGill and Chief Mate Parker. The Court concludes, as a matter of law, that the position of the trash can did not represent an unseaworthy condition on the *F/V Alaska Ranger* on April 5, 2005.

## DECISION OF THE COURT

Plaintiff has failed to meet his burden of proof on his claims of negligence and unseaworthiness. The Court finds in favor of defendant on all plaintiff's claims in this matter. The Clerk shall enter judgment accordingly.

DATED this 15 Day of June 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE